## TRANSPLACE STUTTGART, INC.
### and Hartford Underwriters Insurance Co. *v.* Marty CARTER, Employee, and C-Claw, Inc. Employer

CA 06-711                                    255 S.W.3d 878

Court of Appeals of Arkansas
Opinion delivered April 25, 2007

[Rehearing denied June 6, 2007.]

*Wright, Lindsey & Jennings, LLP*, by: *John D. Davis*, for appellants.

*Dover Dixon Horne, PLLC*, by: *Gary B. Rogers*, for appellee C-Claw, Inc.

*Matthews, Sanders & Sayes*, by: *Doralee I. Chandler* and *Gail O. Matthews*, for appellee Marty Carter.

*Williams & Anderson, PLC*, by: *Peter G. Kumpe* and *Georgia Robinette*; *Robert Digges, Jr.*, American Trucking Associations, Inc.,

Litigation Center, for amici curiae American Trucking Associations, Inc. and Arkansas Trucking Association, Inc.

BRIAN S. MILLER, Judge. Transplace Stuttgart, Inc. appeals a March 15, 2006, Arkansas Workers' Compensation Commission opinion finding Transplace to be the statutory employer of appellee Marty Carter, who sustained compensable injures on September 3, 2004, while employed by appellee C-Claw, Inc. The Commission held that C-Claw was Transplace's uninsured subcontractor. Transplace was therefore liable for Carter's workers' compensation benefits. Transplace claims that the Commission's opinion was not supported by substantial evidence because Transplace is a transportation broker and not C-Claw's prime contractor. We agree with Transplace and therefore reverse and remand.

Transplace is licensed by the United States Department of Transportation (DOT) as a transportation broker. It locates carriers to transport loads for shippers. This process is referred to as "brokering a load." When Transplace has a load to broker, it contacts a carrier and arranges to have the load transported. It informs the carrier where the load is located, when the load needs to be picked up, and when the load needs to be delivered.

Transplace is not a licensed carrier and owns no trucks in which to transport goods. Once Transplace assigns a load to a carrier, it has no input into the method employed by the carrier in transporting the load, and the carrier is responsible for the expenses incurred in transporting the load. The shipper pays Transplace when the load is delivered. Transplace takes its brokerage fee and remits the remainder to the carrier.

On October 25, 2002, Transplace Texas, LP contracted with C-Claw, a DOT-registered carrier. Transplace agreed to broker loads to C-Claw, and C-Claw agreed to pay an eight-percent brokerage fee to Transplace. Transplace Texas assigned the contract to appellant Transplace on June 23, 2004.

On September 3, 2004, Cereal Byproducts contacted Transplace to broker a load from Stuttgart to Dumas. Transplace contacted C-Claw to transport the load. Carter, one of C-Claw's three truck drivers, sustained a compensable injury to his left leg while transporting the load. Carter filed a workers' compensation claim against C-Claw and found that C-Claw had no workers' compensation insurance.

Carter then filed a workers' compensation claim against Transplace alleging that he was Transplace's statutory employee. He asserted that Transplace was the prime contractor and that his employer, C-Claw, was its uninsured subcontractor.

At the hearing before the ALJ, Carter testified that he was hired by C-Claw's president, Harold Clawitter. He said that he was paid by C-Claw and received his W-2 from C-Claw. He stated that he was not a Transplace employee, although, at times, Transplace would call him personally and tell him where to pick up a load.

Harold Clawitter testified that C-Claw owned its trucks, hired its own drivers, and determined the drivers' wages. He explained that C-Claw had three truck drivers, including Carter. Although C-Claw was free to accept loads from other brokers, C-Claw only accepted brokered loads from Transplace. Clawitter admitted that Transplace merely acted as a transportation broker.

Curtis Siems, a dispatcher for Transplace, testified that Transplace serves as the middleman between its customers and the carriers. He said that Transplace was not required to transport loads that it was unable to broker, including the Cereal ByProducts load that was brokered to C-Claw. Moreover, Cereal ByProducts was not required to use Transplace but was free to make arrangements directly with C-Claw as well as any other carriers.

Pamela Johnston, Transplace's Director of Legal and Risk, testified that Transplace did not shift or subcontract to C-Claw any part of its role as transportation broker. However, she did state that Transplace's customers could hold Transplace liable for any loss that resulted from a carrier's non-performance.

The ALJ found that C-Claw was Transplace's uninsured subcontractor and that Transplace was Carter's statutory employee. Transplace was held liable for Carter's workers' compensation benefits, and Transplace appealed to the Commission. The Commission affirmed and adopted the ALJ's decision.

In workers' compensation appeals, we view the evidence and all reasonable inferences from it in the light most favorable to the Commission's findings. *Ellison v. Therma-Tru*, 66 Ark. App. 286, 989 S.W.2d 987 (1999). We affirm the Commission's decision if it is supported by substantial evidence. *See Wren v. Sanders Plumbing Supply*, 83 Ark. App. 111, 117 S.W.3d 657 (2003). Substantial evidence exists if reasonable minds could reach the

same conclusion as the Commission. *See id.* The issue on appeal is not whether we might have reached a different result or whether the evidence would have supported a contrary finding. *Id.* We must affirm the Commission's decision if reasonable minds could reach the Commission's conclusion. *Avaya v. Bryant*, 82 Ark. App. 273, 105 S.W.3d 811 (2003).

We begin our analysis with an examination of Arkansas Code Annotated section 11-9-402(a) (Repl. 2002), which provides that "[w]here a subcontractor fails to secure compensation required by this chapter, the prime contractor shall be liable for compensation to the employees of the subcontractor unless there is an intermediate subcontractor who has workers' compensation coverage." The term "subcontractor" has been defined as:

> One who enters into a contract with a person for the performance of work which such person has already contracted to perform. In other words, subcontracting is merely "farming out" to others all or part of work contracted to be performed by the original contractor.

*Garcia v. A & M Roofing*, 89 Ark. App. 251, 257, 202 S.W.3d 532, 536 (2005) (quoting *Bailey v. Simmons*, 6 Ark. App. 193, 196, 639 S.W.2d 526, 528 (1982)). In order to have a subcontractor arrangement, the entity charged as "prime contractor" must have been contractually obligated to another for the work being done at the time of the injury. *Lofton v. Bryan*, 237 Ark. 642, 375 S.W.2d 221 (1964); *Bailey v. Simmons*, 6 Ark. App. 180, 639 S.W.2d 526 (1982). Relying on our *Garcia* holding, the Commission found that because Transplace had "secured" the job of transporting the grain, it was contractually obligated to Cereal ByProducts and was a "prime contractor" that "farmed out" a portion of its obligation to C-Claw. However, the facts do not support this conclusion.

The testimony established that at the time of Carter's injury, Transplace was operating as a transportation broker for the load assigned to C-Claw. The Federal Motor Carrier Safety Regulations defines the term "broker" as follows:

> (a) Broker means a person who, for compensation, arranges, or offers to arrange, the transportation of property by an authorized motor carrier. Motor carriers, or persons who are employees or bona fide agents of carriers, are not brokers within the meaning of this section when they arrange or offer to arrange the transportation of shipments which they are authorized to transport and which they have accepted and legally bound themselves to transport.

49 C.F.R. § 371.2 (2005). In this case, Transplace functioned as a broker in the quintessential sense. It helped Cereal ByProducts identify and arrange a carrier (C-Claw) that would transport Cereal ByProduct's goods from Stuttgart to Dumas. It was C-Claw, not Transplace, that had an obligation to Cereal ByProducts. Transplace's only role in this case was to match up Cereal ByProducts and C-Claw, for a fee.

■ Because Transplace was not obligated to transport any loads for Cereal ByProducts, Transplace had no work to "farm out" to C-Claw. For these reasons, the subcontracting test set forth in *Bailey* is not satisfied by the facts of this case. Consequently, Transplace was not C-Claw's prime contractor and was not Carter's statutory employer pursuant to the Arkansas Workers' Compensation Act.

Reversed and remanded.

VAUGHT and HEFFLEY, JJ., agree.